Objection Deadline: August 2, 2013 at 4:00 p.m. ET
Evidentiary Hearing Date and Time: August 16, 2013 at 10:00 a.m. ET

Stephen D. Lerner
Elliot M. Smith
Kristin E. Richner
Andrew M. Simon
SQUIRE SANDERS (US) LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 872-9800 (Phone)
(212) 872-9815 (Fax)

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Flat Out Crazy, LLC, *et al.*[1],<br><br>            Debtors. | Chapter 11<br><br>Case No. 13-22094 (RDD)<br><br>Jointly Administered |

### JOINT MOTION OF DEBTORS AND DEBTORS IN POSSESSION AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER GRANTING A SURCHARGE AGAINST THE COLLATERAL OF THE HILLSTREET FUND IV, L.P. UNDER SECTION 506(c) OF THE BANKRUPTCY CODE

---

[1] The Debtors in these cases and the last four digits of their Employer Identification Numbers are: Stir Crazy Café West Nyack, LLC (5828); Flat Out Crazy, LLC (0160); SCR Operations, LLC (9375); SCR Hospitality, LLC (4309); SCR Concessions, LLC (6669); Stir Crazy Restaurants, LLC (2289); Stir Crazy Café Oakbrook, LLC (2976); Stir Crazy Café Northbrook, LLC (7070); Stir Crazy Café Woodfield, LLC (1104); Stir Crazy Café Great Lakes, LLC (9634); Stir Crazy Café Boca Raton, LLC (9942); Stir Crazy Café Creve Coeur, LLC (0003); Stir Crazy Café Legacy Village, LLC (8744); Stir Crazy Café Cantera, LLC (4842); and Stir Crazy Operations, LLC (8114).

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................2

JURISDICTION AND VENUE ...........................................................................5

BACKGROUND ...................................................................................................5

    The Sale Process ...........................................................................................5

    HillStreet's Unjustified Opposition to a Chapter 11 Sale Process..................7

    The Results Yielded by the Chapter 11 Process Could Not Have Been Obtained
    Through Chapter 7 or Other Alternative Means ...........................................9

    The Efforts of the Professionals to Preserve and Maintain the Debtor's Business ...........13

    The Professionals Acquiesced to Significant Concessions and Financial
    Accommodations for HillStreet's Primary and Direct Benefit.........................16

RELIEF REQUESTED.........................................................................................19

BASIS FOR RELIEF ...........................................................................................20

    I.       HillStreet has Received a Direct and Primary Benefit...........................26

    II.      The Services were Necessary and Reasonable ....................................38

    III.    HillStreet's Own Actions Caused Certain of the Fees and Expenses.................40

NOTICE.................................................................................................................41

NO PRIOR REQUEST ........................................................................................42

EXHIBIT A:  Recovery Analysis

EXHIBIT B:  Getzler Henrich Composite Exhibit

EXHIBIT C:  Squire Sanders Composite Exhibit

EXHIBIT D:  Committee Professionals Composite Exhibit

EXHIBIT E:  Retainer and Carveout Application Chart

EXHIBIT F:  Proposed Order

CINCINNATI/99443

# TABLE OF AUTHORITIES

**Cases**

*In re 652 West 160th LLC*
    2008 Bankr. Lexis 807 (Bankr. S.D.N.Y. 2008)................................................................22

*In re Campbell Mills, Inc.,*
    1994 Bankr. Lexis 1854 (Bankr. S.D.N.Y. 1994)............................................................22

*In re Croton River Club, Inc.,*
    162 B.R. 656 (Bankr. S.D.N.Y. 1993)..................................................22, 23, 24, 25, 31, 36

*Equitable Gas Co. & Equibank N.A.*
*(In re McKeesport Steel Castings Co.)*
    799 F.2d 91 (3rd Cir. 1986) .............................................................................................24

*General Electric Credit Corporation v. Levin & Weintraub*
*(In re Flagstaff Foodservice Corporation)*
    739 F.2d 73 (2nd Cir. 1984)............................................................................................21

*General Electric Credit Corporation v. Peltz*
*(In re Flagstaff Foodservice Corporation)*
    762 F.2d 10 (2nd Cir. 1985)............................................................................................21

*First Service Group, Inc. v. O'Connell,*
*(In re Ceron)*
    412 B.R. 41 (E.D.N.Y. 2009) ..........................................................................................39

*IRS v. Boatmen's First Nat'l Bank,*
    5 F.3d 1157 (8th Cir. 1993) ............................................................................................21

*In re Kohl,*
    421 B.R. 115 (Bankr. S.D.N.Y 2009)..............................................................................21

*In re Lunan Family Restaurants Limited Partnership,*
    192 B.R. 173 (Bankr. N.D. Ill 1996) ..............................................................5, 27, 28, 39

*In re McLean Industries, Inc.,*
    84 B.R. 340 (Bankr. S.D.N.Y. 1988)...............................................................................22

*In re Nutri/System, Inc.,*
    1994 Bankr. Lexis at *22 (Bankr. E.D. Pa. Mar. 23, 1994)..................................21, 22, 36

*Omni Partners, L.P. v. Pudgie's Dev. Of NY, Inc.*
*(In re Pudgie's Development of NY, Inc.)*
    239 B.R. 688 (S.D.N.Y. 1999).....................................................................................21, 22

CINCINNATI/99443

*Rifken v. CapitalSource Finance, LLC*
*(In re Felt Mfg. Co.,)*
    402 B.R. 502 (Bankr. D.N.H. 2009) .......................................................21, 22, 36

*Shaw, Licitra, Parente, Esernio & Schwartz, P.C. v. Travelers Indemnity Company*
*(In re Grant Associates)*
    154 B.R. 836 (S.D.N.Y. 1993) ...........................................21, 22, 23, 25, 36, 38

*In re Stable Mews Associates,*
    49 B.R. 395 (Bankr. S.D.N.Y. 1985) .................................................22, 26, 35, 38

*In re Strategic Labor, Inc.,*
    467 B.R. 11 (Bankr. Mass. 2012) .....................................................................27

*In re Trim-X, Inc.,*
    695 F.2d 296 (7th Cir. 1982) ...........................................................................22

*In re Value City Holdings, Inc.,*
    436 B.R. 300 (Bankr. S.D.N.Y. 2010) .............................................................38

**Statutes**

11 U.S.C. § 330.......................................................................................................38

11 U.S. C. § 363.........................................................................................1, 16, 36, 39

11 U.S.C. § 506(c) ........................................................................................... passim

28 U.S.C. § 157.........................................................................................................5

28 U.S.C. § 1334.......................................................................................................5

28 U.S.C. § 1408.......................................................................................................5

28 U.S.C. §1409........................................................................................................5

**Miscellaneous**

124 Cong. Rec. H11089 (daily ed. Sept. 28, 1978) .......................................................21

1978 U.S. Code Cong. & Ad. News 6436 ...................................................................21

CINCINNATI/99443

Flat Out Crazy, LLC ("FOC") and the above-captioned affiliated debtors (collectively,

the "Debtors"), debtors and debtors in possession in these bankruptcy cases (the "Cases"), and

the Official Committee of Unsecured Creditors (the "Committee") appointed in these Cases,

hereby move this Court (the "Court"), pursuant to section 506(c) of the United States Bankruptcy

Code (the "Bankruptcy Code") and the reservation of rights expressly provided for in paragraph

9 of the Final Order (A) Authorizing Debtors in Possession to Obtain Postpetition Financing

Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364; (B) Granting Liens, Security Interests and

Superpriority Claims; (C) Authorizing Use of Cash Collateral and Granting Adequate Protection;

and (D) Modifying the Automatic Stay (the "Final DIP Order") (Doc. 234), for an order granting

a surcharge against the collateral of The HillStreet Fund IV, L.P. ("HillStreet") in an amount not

less than $1,816,773.82 (the "Surcharge"), representing the necessary and reasonable costs and

expenses incurred by the Debtors, the Committee, and their respective professionals (the

"Professionals") in preserving, enhancing and disposing of Hillstreet's collateral.

This Motion is supported by the Declaration of William H. Henrich in Support of Joint

Motion of Debtors and Debtors in Possession and the Official Committee of Unsecured Creditors

for an Order Granting a Surcharge against the Collateral of The HillStreet Fund IV, L.P. (the

"Henrich Dec.") and the Declaration of Robert S. Hill in Support of Joint Motion of Debtors and

Debtors in Possession and the Official Committee of Unsecured Creditors for an Order Granting

a Surcharge against the Collateral of The HillStreet Fund IV, L.P. (the "Hill Surcharge Dec."),

each filed contemporaneously herewith, and the entire record of these Cases.[1]  In further support

---

[1] The Debtors anticipate that additional declarations in further support of this Motion may be filed.  In addition, the Debtors' and Committee' Professionals who are required to file fee applications have each filed, or will soon file, a fee application seeking interim approval of the fees and expenses incurred, including those fees and expenses that are included in the Surcharge, which are incorporated herein by reference.  Getzler Henrich & Associates, LLC was retained as an officer of the Debtors pursuant to section 363 of the Bankruptcy Code and is not required to file fee applications under the terms of the final order approving its retention (Doc. 123).

of this Motion, the Debtors and Committee respectfully state as follows:

**INTRODUCTION**

1.      HillStreet has received numerous primary and direct benefits as a result of the administration of these Cases and the success of the sale process through which it was able to realize on its collateral for the highest possible recovery.   Under applicable law, HillStreet is required to pay the necessary and reasonable costs of receiving these very substantial benefits.

2.      The principal activity of these Cases has been the sale process for the Debtors' Flat Top Grill and Stir Crazy restaurant chains required by HillStreet under the terms of the Final DIP Order.   The sale process yielded an aggregate purchase price for the Flat Top Grill Assets and the Stir Crazy Assets in excess of $10 million and an aggregate recovery for HillStreet in the approximate amount of $6,722,000.   Notably, approximately $3.3 million of the purchase price was generated by the sale of the Stir Crazy Assets which HillStreet had represented to the Court were worthless, were allegedly posing a substantial risk to the value of its Flat Top Grill collateral, and should be closed immediately.[2]   This result is exponentially better than what could have been achieved by HillStreet through any other available means and is the direct result of the substantial efforts of the Debtors, the Committee, and the Professionals to keep the restaurants operating as a valuable going concern, to increase the value of the restaurants and to run an efficient and value maximizing sale process which took approximately three months to conclude.

3.      The success of the asset sale was made possible through a series of earlier accomplishments, each of which was necessary and reasonable, and directly and primarily

---

[2] The Court will recall that one of the significant disputes standing in the way of an agreement for DIP financing on the night of February 28 was the length of time of the sale process for the Stir Crazy Assets. HillStreet was adamant that nine of the eleven Stir Crazy stores should be closed immediately but ultimately agreed to include them in the sale process as long as the process was shortened to align with the sale of the Flat Top Grill Assets.   *See*, HillStreet DIP Objection (Doc. 165), ¶¶ 4-8.

benefitted HillStreet.  As set forth in detail below, with the assistance of the Committee and the

Professionals, the Debtors, among other things:

- reduced the cost burden and negative cash flow of the Company's business operations and improved profitability, making the Company as a whole more saleable and attractive to potential bidders;

- closed unprofitable stores and rejected related leases;

- operated the profitable stores on a shoe-string budget, preserving going concern value and beating many of the projections for both revenue and expenses[3];

- secured management, employee, vendor, and landlord support for the sale process;

- obtained access to cash collateral and adequate DIP financing to preserve the going concern value of the business pending the sale and run the sale process itself;

- successfully litigated a dispute with PACA trust creditors who were demanding immediate segregation of funds for the payment of allowed PACA trust claims (if granted, the Debtors would not have had sufficient funds to segregate and would have likely needed to terminate the sale process and "go dark");

- negotiated a stalking horse purchaser agreement with Victory Park for the Flat Top Grill Assets;

- conducted a marathon auction with active and competitive bidding for each restaurant chain;

- successfully obtained approval of the sale to HillStreet free and clear of liens over the vehement objections of Vogen Funding; and

- closed the transactions with HillStreet and attended to necessary post-closing matters.

By preserving and materially improving the going concern value of the Debtors through a

fulsome sale process that HillStreet itself ultimately mandated, HillStreet achieved maximum

---

[3] Because the Debtors beat many of their revenue and expense projections, HillStreet only had to fund approximately $914,000 out of a total $1,018,000 in availability under the DIP Facility.  The amounts funded include approximately $114,000 in post-closing credit card receipts which the Debtors asserted belonged to them and HillStreet asserted were acquired by them under their Asset Purchase Agreement.  The Debtors retained these credit card receipts but HillStreet treated their retention as an advance under the DIP Facility.  In addition, the amounts funded also include amounts necessary to pay corporate retention bonuses as approved by the Court, which amounts were in addition to the projected need under the DIP Budget.  The Debtors exceeded projections for a small number of line items in the Budget due to circumstances largely beyond their control.  HillStreet refused to fund these expenses to the extent they exceeded the permitted variance for the relevant line items, while at the same time accepting the benefits of the Debtors' performance for other line items of the DIP Budget.  Henrich Dec. ¶¶ 7-12.

- 3 -

value and its net recovery was substantially greater than it expected and what could have been achieved through any other available means.[4]

4.    Surprisingly, for all of HillStreet's concern over the level of transaction costs and professional fees, it was HillStreet itself, through its excessive objections and litigation tactics, who caused the Debtors and the Committee to incur significant additional expense and professional fees.  Had HillStreet agreed to provide financing on reasonable terms from the outset (rather than waiting until one month into the Cases in order to avoid a priming DIP from Victory Park or Vogen Funding), substantial fees and expenses could have been avoided. Instead, the Debtors were forced to seek to operate on cash collateral and to run a time-consuming process to solicit DIP financing proposals from other sources.  Henrich Dec. ¶¶ 13-19, 34.  The lack of immediate financing adversely impacted the sale process, causing potential bidders to delay due diligence given the uncertainty of the viability of the sale process.  Hill Surcharge Dec. ¶ 9.  The Debtors were also forced to respond to HillStreet's four objections to cash collateral and financing matters (Doc Nos. 21, 75, 156, and 165), to prepare for a contested adequate protection hearing, and, along with the Committee, to negotiate three different DIP financing orders with three different lenders.[5]  Henrich Dec. ¶¶ 13-19, 34.  The Debtors and the Committee did not choose to incur these fees and expenses.  They were forced to incur them as a direct result of HillStreet's actions.  Had HillStreet been more cooperative and reasonable in these Cases, it could have avoided much of the costs and expenses attributable to financing and other matters that it now opposes.

---

[4] HillStreet's participation in the auction and its willingness to credit bid its secured debt chilled bidding and was an obstacle to maximizing value.  Certain previously interested bidders did not participate in the auction when they learned of HillStreet's intent to credit bid.  Even bidders that participated in the auction limited their bidding when they saw the extent to which HillStreet kept credit bidding.  Hill Surcharge Dec. ¶ 6.

[5] The Debtors had also negotiated a fourth agreement with yet another possible lender, but ultimately selected the offer from Victory Park as the higher and better offer to pursue.

- 4 -

5.      Under applicable Second Circuit precedent, which is amply satisfied by the record of these Cases, the Debtors and the Committee are authorized to seek and recover the necessary and reasonable costs of the direct and primary benefits received by HillStreet.  These include all of the professional fees and expenses and certain other expenses incurred by the estates for maintaining, enhancing, and disposing of HillStreet's collateral and those incurred as a result of HillStreet's own actions.  *See, e.g., In re Lunan Family Restaurants Limited Partnership*, 192 B.R. 173 (Bankr. N.D. Ill. 1996) (applying *Flagstaff* standards in connection with the preservation and sale of a restaurant operation and finding that the secured creditor received a direct and primary benefit through the Debtors' operation of the restaurants as a going concern pending the ultimate sale of the assets).  Thus, under section 506(c) of the Bankruptcy Code, the Debtors and the Committee respectfully request that the Court grant the Surcharge in its entirety.

## JURISDICTION AND VENUE

6.      The Bankruptcy Court has jurisdiction over these Cases pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.      Debtor Stir Crazy Café West Nyack, LLC is a limited liability company organized under the laws of the state of New York and has been so organized for more than 180 days prior to the filing date in these Cases.  Accordingly, venue of its chapter 11 case and the chapter 11 cases of each of the affiliated Debtors, as well as any proceedings arising in these Cases, is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### The Sale Process

8.      On May 2, 2013, the Debtors closed the sales of substantially all of their Flat Top

CINCINNATI/99443

Grill Assets and Stir Crazy Assets (collectively, the "Assets") to HillStreet.[6] The closing marked the culmination of an extensive three month sale process which the Debtors commenced at the outset of the Cases for the Flat Top Grill Assets and was later required for both chains under the Debtors' post-petition financing facility (the "DIP Facility") with HillStreet. The sale process is described in detail in the Affidavit of Robert S. Hill in Support of the Flat Top Grill Sale and the Stir Crazy Sale (the "Hill Sale Affidavit") (Doc. 308), which is incorporated herein by reference.

9.        The success of the sale process and the enhanced recovery for HillStreet cannot be legitimately challenged and speaks volumes as to the efforts of the Debtors, the Committee, and their Professionals to maximize value in these Cases. Collectively, the sales generated an aggregate purchase price in excess of $10 million, of which approximately $6.7 million is attributable to the Flat Top Assets and approximately $3.3 million to the Stir Crazy Assets.[7] The purchase price is comprised of a combination of cash, a credit against amounts owed to HillStreet under the DIP Facility and against HillStreet's prepetition senior and junior secured claims, and the assumption of certain liabilities.

10.        Pursuant to the asset purchase agreements between the Debtors and HillStreet, (a) the Carve-Out required under the Final DIP Order has been fully funded in cash; (b) HillStreet has assumed liability for the payment of all cure amounts for nonresidential real property leases

---

[6] As the Court is aware, HillStreet is the Debtors' DIP financing lender and prepetition senior and junior secured lender. HillStreet acquired the senior debt from U.S. Bank National Association prior to the Petition Date at a steep discount, a transaction that U.S. Bank agreed to principally as an accommodation to the Debtors and certain of its board members and equity holders with whom U.S. Bank has a strong relationship. The transaction relieved HillStreet of restrictions under an inter-creditor agreement with U.S. Bank and enabled HillStreet to receive the benefits the Debtors have generated in these Cases. In addition to being a lender, HillStreet also owns 5% of the equity of debtor Flat Out Crazy, LLC as a holder of the Series D Preferred Shares. Prepetition, HillStreet also had a designated representative serving on the Board of Directors of Flat Out Crazy, LLC holding consent rights for certain material actions. On January 17, 2013, Mr. Christian L. Meininger, HillStreet's President and then representative, resigned as a Director, and the position has since remained vacant.

[7] As the Court will recall, at the outset of the Cases, HillStreet represented that nine of the eleven Stir Crazy stores had no value and should be closed immediately. Due to the efforts of the Debtors and their Professionals, ten out of eleven stores became profitable, nine of which were purchased by HillStreet for approximately $3.3 million.

- 6 -

and contracts to be assumed and assigned as part of the transaction and for various employee obligations; and (c) the amount of secured prepetition and postpetition debt owing to HillStreet has been reduced by approximately $6,722,000.

11.     To be sure, it has not been an easy road thus far.  The Debtors were required by the circumstances they faced to commence these Cases without adequate financing or a clear path to an exit strategy.  At critical stages of these Cases, the Debtors, with the help of the Professionals, faced and overcame significant issues raised by HillStreet, creditors asserting PACA trust claims, and Vogen Funding, LP ("Vogen").[8]  For instance, had the Debtors not been able to obtain financing the night of February 28, they would have had no other option but to close their stores and "go dark" the following morning, a result that would have irreparably harmed the value of HillStreet's collateral and the sale process.  Henrich Dec. ¶ 6.  A similar result would have ensued had the Debtors been required to segregate funds for the benefit of PACA creditors without funding from HillStreet.  Henrich Dec. ¶ 6.  But in each instance, the Debtors were able to successfully move forward with the sale process and their efforts to preserve and maximize the value of their assets.

### HillStreet's Unjustified Opposition to a Chapter 11 Sale Process

12.     Initially, HillStreet strongly opposed proceeding in chapter 11 and was staunch in its belief that the sale process contemplated by the Debtors could not be successful, calling the chapter 11 filings and the sale process an "unmitigated disaster" and a "total failure."  Hillstreet

---

[8] As described below, the dispute with the PACA claimants was caused by HillStreet and its refusal to segregate funds immediately for the benefit of the PACA claimants.  HillStreet's position in this regard caused the PACA claimants to contest entry of the Final DIP Order and caused the Professionals to incur substantial fees and expenses litigating the dispute with the PACA claimants.  The dispute was eventually resolved by the Court in favor of the Debtors based, in part, on HillStreet's belated agreement to post a deposit to backstop its agreement to pay in full all allowed claims of PACA claimants.  Similarly, as described below, before and following the closing of the asset sales, HillStreet engaged in negotiations with Vogen for a transaction which required the participation of the Professionals and caused the Debtors and the Committee to incur fees and expenses to facilitate the transaction.

DIP Objection (Doc. 156), ¶¶ 2-4.  HillStreet feared it would receive "close to nothing" from the

sale proceeds if the Debtors were permitted to designate Victory Park Capital Advisors, LLC

("Victory Park") as the stalking horse purchaser for the Flat Top Grill Assets for a $4 million

cash purchase price.  *Id*. at ¶ 2.  HillStreet believed its best prospects for recovery were through a

liquidation and private sale to HillStreet under chapter 7 or through multiple receiverships or

secured party sales through which HillStreet would seek to salvage a small number of stores and

form a "mom and pop" operation with a total gross enterprise value of what it estimated to be

$6,432,990.  *Id*. at ¶¶ 6-7.  To achieve that "best case" result, HillStreet envisioned having to

spend approximately $2.2 million, thereby generating a net recovery for itself of approximately

$4.2 million in enterprise value.[9]  *Id*.

13.    HillStreet also believed that all of the Debtors' value resided with the Flat Top

Grill Assets and that the Stir Crazy Assets "add nothing to the equation.  Those assets have a

negative EBIDTA and the costs to sell those assets or reorganize in Chapter 11 confirm an even

deeper negative value for these assets."  *Id*. at ¶ 50.  HillStreet was adamant that nine of the

eleven Stir Crazy stores needed to be closed immediately:

> The bottom performing nine stores at Stir Crazy are clearly
> ***sucking the life out of Flat Top and eroding HillStreet's valuable
> collateral***.  These bottom nine performing Stir Crazy Stores are a
> drain on cash collateral, and if Debtors proceed with a DIP priming
> lien, the good assets of Flat Top will be used to fund the continued
> operations of the unprofitable Stir Crazy stores.  That is the
> primary reason why HillStreet sought to block a DIP priming lien
> and convert the cases to Chapter 7.  HillStreet wanted to force the
> closure of all but two of the Stir Crazy stores to end the bleeding.
>
> Running a sale process with all the Stir Crazy restaurants cannot be
> justified at this time.  The entire operation cannot be sold.  No
> rational buyer will want to purchase the nine money losing stores

---

[9] As set forth below, this estimated recovery is premised upon faulty assumptions.  In reality and when reasonable
assumptions are used, HillStreet's recovery in a chapter 7 case or through multiple receiverships and foreclosure
proceedings would have been virtually non-existent.

> so inevitably there will be a Chapter 7 involving those assets.
> HillStreet sees no reason for hundreds of thousands of dollars, if
> not millions, to be burned up in operational costs and professional
> fees in the chase for an illusory sale of all the money losing Stir
> Crazy restaurants.

HillStreet Supplemental DIP Objection (Doc. 165), ¶¶ 4-5 (emphasis added).

14.     HillStreet's fears were improvident and have proven to be utterly unfounded.  To

the contrary, it is abundantly clear that HillStreet received substantial benefit through the chapter

11 process and, in fact, no party has benefited more than HillStreet.  It is beyond dispute that

HillStreet has received a direct and substantial benefit from the administration of these Cases, the

significant efforts of the Professionals, and the success of the sale process.

### The Results Yielded by the Chapter 11 Process Could Not have been Obtained through Chapter 7 or Other Alternative Means

15.     HillStreet claims that it could have obtained the same or better values and

recovery through alternative means, including through a chapter 7, multiple receiverships or

secured party sales, and with less cost and expense.  This claim defies logic and is premised upon

numerous faulty assumptions.

16.     At the February 19, 2013 hearing in these Cases, HillStreet advised the Court of

its intention to file a motion to convert the Cases to chapter 7 and that HillStreet believed it was

smarter to pursue a "more efficient" sale process with a chapter 7 trustee.  Feb. 19 Hearing Tr., pg.

16, lines 3-10.  At that time, the Court recognized some of the inherent flaws with that position:

> Well, I guess smart is in the eye of the beholder.  And I'll hear
> evidence on that.  But I'm glad you recognize and I'm glad your
> client recognizes that these things don't come for free … And of
> course, you all will be shut down in Chapter 7 in all likelihood
> unless you have hit the ground running with the costs.  So you
> know the all [sic] adage.  You don't really want to have collateral
> that eats.  It's not just limited to owning cows.  And I hope your
> client understands that.

Id. at pg. 17, lines 2-12.

- 9 -

17.     This exchange underscores HillStreet's deep lack of understanding and appreciation of the chapter 7 process and effects of conversion.  Upon a conversion, there is no guarantying continuity of operations or the cooperation of a trustee.  As the Court indicated, in all likelihood the business would be shut down for a period of time.  And, in the estimation of Robert Hill, the Debtors' investment banker, had any of the Debtors' stores closed, it would have been exceedingly unlikely that it would ever re-open prior to a transaction with new ownership. Hill Surcharge Dec. ¶ 8.  In addition, once appointed, a trustee would need to quickly overcome a steep learning curve as it gets up to speed and evaluates the business operations, the issues impacting value and profitability, and the best way to maximize value.  At which point, even in the unlikely situation that the stores were capable of re-opening and operating as going concerns, the trustee might disagree with the wisdom of HillStreet's strategy of pursuing a private sale to HillStreet, especially given the competing claims to the collateral from PACA trust claimants, multiple taxing authorities and Vogen Funding, and the potential hornet's nest of trying to allocate the purchase price of an asset sale among these battling entities.  As in chapter 11, a chapter 7 trustee is bound by the duty to maximize value of the Debtors' assets for all creditors. Knowing the actual levels of interest and the extent of the bidding borne out by the chapter 11 process, the trustee would have ignored its duty if it capitulated to HillStreet's plans for a quick recovery through a private sale, if there was anything of value to be sold following a shut down.

18.     HillStreet's rosy view of what it could accomplish in a chapter 7 also fails to account for any period of shut down and its deleterious effects on (a) employee retention, (b) vendor, landlord and customer support, and (c) the interest of potential bidders and the saleability of the assets, as well as the negative publicity that would likely ensue.[10]  Furthermore, the

---

[10] HillStreet also failed to take into account accrued payroll obligations and sales tax obligations (paid one month in arrears) at the time the case would be converted.  Nor did it take into account the full extent of PACA trust claims.

CINCINNATI/99443

Debtors' restaurants did not have any material hard assets. <u>Henrich Dec</u>. ¶ 23; <u>Hill Surcharge</u> <u>Dec</u>. ¶ 7. Their value was tied to their customers, and any disruption to patronizing patterns would destroy that value. <u>Henrich Dec</u>. ¶ 23; <u>Hill Surcharge Dec</u>. ¶ 7. Any negative publicity and closure of operations would disrupt patronizing patterns and significant value would be lost even if employees ultimately returned to work and vendors continued to ship. <u>Henrich Dec</u>. ¶ 23; <u>Hill Surcharge Dec</u>. ¶ 8. Once a restaurant closes and negative publicity ensues, customers are lost. <u>Henrich Dec</u>. ¶ 23; <u>Hill Surcharge Dec</u>. ¶ 8.

19.     Even in chapter 11, the Debtors had to overcome significant challenges with liquor regulators and key vendors to ensure continued supply of liquor, produce, and other goods necessary to operate the business. <u>Henrich Dec</u>. ¶ 24. The Debtors also had to ensure the support of management and employees. <u>Henrich Dec</u>. ¶ 24; <u>Hill Surcharge Dec</u>. ¶ 8. Without the guaranty of a paycheck and other promised compensation, the Debtors were at risk of key store managers and employees leaving. <u>Henrich Dec</u>. ¶ 24; <u>Hill Surcharge Dec</u>. ¶ 8. Undoubtedly, these issues would have been compounded in a chapter 7 scenario.

20.     Moreover, HillStreet made no secret of its intention to immediately close nine out of the eleven Stir Crazy stores. Through the efforts of the Debtors, those stores were rehabilitated and made saleable, ultimately yielding a purchase price of approximately $3.3 million (compared with the approximately $1.1 million in enterprise value that HillStreet assigned to the two Stir Crazy stores it believed were worth keeping alive). <u>Henrich Dec</u>. ¶ 25. In a chapter 7, receivership, or other proceeding, HillStreet would not have realized the benefits of the improvements to the value of Stir Crazy and would have left at least $2.2 million on the table, even according to its flawed numbers. <u>Henrich Dec</u>. ¶ 25.

21.     Immediately following the February 19, 2013 hearing at which HillStreet revealed

its intention to pursue conversion, the Chief Restructuring Officers, counsel for the Debtors, and counsel for the Committee endeavored to persuade counsel for HillStreet that a conversion to chapter 7 would destroy value and irreparably harm the sale process, which view was unanimous and supported by the Debtors' investment banker, J.H. Chapman. Henrich Dec. ¶ 26. Even the mere filing of a motion to convert would have caused significant harm by irreparably damaging the interest of potential bidders, the morale of employees (many of whom would likely have left) and resulting in the closure of stores pending the resolution of such a motion. Henrich Dec. ¶ 26; Hill Surcharge Dec. ¶ 10. Mr. Henrich, one of the Chief Restructuring Officers, discussed these harms at length with Mr. Tom Perrazo, one of HillStreet's primary business representatives. Henrich Dec. ¶ 26. Ultimately, HillStreet was persuaded to abandon its conversion strategy for the time being and no conversion motion was ever filed.

22.    Similarly, HillStreet could not have achieved comparable results in any non-bankruptcy proceeding. Among other things, such a proceeding would not have had the benefits of the automatic stay, the ability to reject leases and contracts, the ability to sell free and clear of liens, and the ability to have a single centralized forum for dealing with all aspects of the asset sale.

23.    Having now completed the chapter 11 sale process, the Debtors know with certainty the values attributable to the Assets, the recovery to HillStreet, and the true number of hours (in terms of professional man-hours) it took to accomplish these results, which allows the Debtors and the Court to truly test HillStreet's assumptions. Attached hereto (and to the Henrich Declaration) as Exhibit A is a chart comparing (a) the actual sale prices and recovery achieved through the chapter 11 process; (b) HillStreet's projected sale prices and recovery through a chapter 7 as set forth in Exhibit B to its DIP Objection (Doc. 156) (which numbers are significantly overstated and based on faulty assumptions); (c) the Debtors' projected sale prices

- 12 -

and recovery through a chapter 7 (with reasonable assumptions); and (d) the sale price and recovery under the Victory Park stalking horse agreement with respect to the Flat Top Grill Assets.

24.     In summary, the chapter 11 process allowed HillStreet to recover approximately $6,722,000, representing the entirety of its postpetition DIP financing loans, the entirety of its prepetition senior secured debt that it acquired from U.S. Bank, and approximately $4,558,000 of its $5 million in principal amount of prepetition junior secured debt.  This compares with (i) an erroneously inflated net recovery on its prepetition junior secured debt of $2,931,000 under HillStreet's flawed chapter 7 scenario; (ii) a net recovery on its prepetition senior secured debt of only $224,000 and no recovery on its prepetition junior secured debt under Victory Park's stalking horse agreement for the Flat Top Grill Assets; and (iii) a net recovery on its prepetition senior secured debt of only $77,000 and no recovery on its prepetition junior secured debt under the Debtors' chapter 7 liquidation projections.  Henrich Dec. ¶ 28.

25.     To achieve the value ultimately obtained in the section 363 sale, the Professionals necessarily and reasonably incurred thousands of hours of professional time that was spent on business operations, lease rejections, the sale process, financing matters, and the PACA dispute, among other things.

### The Efforts of the Professionals to Preserve and Maintain the Debtors' Business

26.     As soon as they were retained, Messrs. Henrich and Samson, the Debtors' co-chief restructuring officers (the "Chief Restructuring Officers"), took immediate steps prepetition (which were continued postpetition) to stabilize operations and improve profitability across the entire business.  Among other things, they (a) closed unprofitable stores, (b) secured the support of key vendors to continue supplying the Debtors, (c) ensured a constant liquor supply despite certain vendors placing the Debtors on a delinquency list which resulted in liquor regulators taking action to cut off the Debtors' liquor supply, (d) increased menu pricing at all Stir Crazy

- 13 -

store locations by five percent, and (e) significantly reduced expenses. <u>Henrich Dec</u>. ¶ 7. At the corporate level, the Chief Restructuring Officers reduced executive corporate payroll on an annualized basis by approximately $500,000 and immediately reduced the corporate headquarters monthly rent from $19,000 to $9,000.[11] <u>Henrich Dec</u>. ¶ 7.

27.    HillStreet did not give these efforts sufficient time to take hold and bear fruit. Ultimately, these efforts had a material impact on improving business operations and increasing enterprise value, especially at the Stir Crazy locations,[12] and on the success of the asset sales. <u>Henrich Dec</u>. ¶ 10. In total, nearly $2.5 million in cash burn was eliminated across the entire business. <u>Henrich Dec</u>. ¶ 10. Based on March and April results alone, approximately $1.5 million in additional annualized cash profit was generated at the Stir Crazy locations due to the menu pricing increase, motivated area and store managers, a targeted marketing campaign with limited funds, and the retention of customers. <u>Henrich Dec</u>. ¶ 10. Over the nine week DIP financing period, cash receipts / revenue across the board increased by approximately four percent compared to budget. <u>Henrich Dec</u>. ¶ 10.

28.    As a result, the Debtors were able to solicit substantial interest in the Assets from numerous potential bidders, including many of the Debtors' head-to-head competitors. Notably, HillStreet eventually agreed with the Debtors' business judgment, and reversed its earlier vehement opposition, to the selection of Victory Park as the stalking horse bidder for the Flat Top Grill Assets. On April 17, 2013, the Debtors, in consultation with the Committee, conducted an auction for the Assets lasting approximately thirteen hours at which four qualified

---

[11] The Chief Restructuring Officers negotiated for a further reduction to $6,500 a month for HillStreet's benefit during the transition period under the Transition Services Agreement executed in connection with the sale closing.

[12] Ultimately, HillStreet purchased thirteen out of the fourteen Flat Top Grill stores. Moreover, the value of Stir Crazy's operations was increased to such an extent that HillStreet ultimately purchased nine out of eleven Stir Crazy stores. A tenth store also improved performance due to the efforts of the Debtors and their Professionals such that it was profitable on an annualized basis by approximately $150,000 a year, but was closed due to geographic location.

- 14 -

bidders competed for the Flat Top Grill Assets and four qualified bidders competed for the Stir Crazy Assets over multiple rounds encompassing in excess of twenty bids. HillStreet was among the bidders for the Flat Top Grill Assets and the Stir Crazy Assets and was ultimately selected as the successful bidder in each auction. The sale generated a primary and direct benefit for HillStreet – an aggregate purchase price in excess of $10 million – at a limited and artificially low cost. At present, HillStreet has received substantially all the benefits and proceeds of the sale process while bearing very little cost. For example, HillStreet: (a) advanced approximately $914,000 under the DIP financing facility (including approximately $114,000 in credit card receipts that, in the Debtors' view, belonged to them) compared with a budget of $1,018,000, (b) did not have to pay any professional fees prior to the closing of the asset sales, and (c) funded a Carve-Out (as defined in the Final DIP Order) for a fraction of the actual professional fees and transaction costs incurred to date (subject to the right of the Debtors' estates to seek a surcharge under section 506(c) of the Bankruptcy Code).[13]

29.     Moreover, while the DIP Facility was intended to allow for payment of all reasonable and actual operating expenses of the Debtors, HillStreet has refused to fund certain expenses totaling approximately $84,200 for necessary and reasonable postpetition expenses. Specifically, HillStreet has refused to fund (a) approximately $59,200 in fees and expenses incurred by the Debtors' noticing agent, Kurtzman Carson Consultants, through the end of April, 2013 in connection with the sale process[14], and (b) approximately $25,000 necessary to prepare

---

[13] Certain potential bidders chose not to participate in the auction because of HillStreet's ability to credit bid. Thus, to some extent, the bidding for the Assets was chilled by HillStreet and the true value of the Assets likely exceeds the purchase price realized through the auction. Indeed, the Chief Restructuring Officers have received inquiries from auction bidders as to whether HillStreet is interested in selling any of the Assets it acquired. This further evidences the extent to which the chapter 11 process and the efforts of the Debtors, the Committee, and the Professionals have increased value and directly benefited HillStreet. Hill Surcharge Dec. ¶ 6.

[14] KCC incurred significant expenses in connection with the sale process totaling in excess of $68,000, which caused their total fees and expenses to significantly exceed the line items relating to KCC in the DIP Budget. Among other things, these expenses included approximately $22,000 for the publication of sale related notices in The New York

- 15 -

final tax returns for the 2012 calendar year. Each of these expenses falls within budget categories but are in amounts above the permitted 15% budget variance.

**The Professionals Acquiesced to Significant Concessions and Financial Accommodations for HillStreet's Primary and Direct Benefit.**

30.    The Debtors were not able to achieve these results on their own. Critical to the Debtors' success were significant concessions and financial accommodations shouldered by the Professionals for HillStreet's primary and direct benefit. Prior to the Petition Date, in response to a request by HillStreet to the Debtors' board of directors for fee concessions, counsel for the Debtors reluctantly agreed to provide the Debtors with a seven and one-half percent discount on its customary fees and not to charge the Debtors for the costs of airfare traveling to and from New York for these Cases.[15] As reflected in Squire Sanders' monthly fee statements on file with the Court, these voluntary reductions have already resulted in a reduction of fees and expenses in excess of $149,000 in the first four months of these Cases alone.

31.    Similarly, the Debtors' Chief Restructuring Officers, one of whom (Mr. Samson) was dedicated to the Debtors on a full time basis, reluctantly agreed to (i) reduce their customary rates by approximately fourteen percent, (ii) cap Mr. Samson's hours charged to 40 hours per week (Mr. Samson has worked in excess of 30% over this cap, averaging 52 hours a week), and (iii) otherwise limit the staffing for these Cases. The Chief Restructuring Officers were retained as officers of the Debtors under section 363 of the Bankruptcy Code and were entitled to weekly compensation under the terms of their engagement letter and as approved by the Court, which they forewent for HillStreet's benefit. Their total fees are comparable to the $500,000 worth of

---

Times. The Debtors were able to satisfy a portion, but not all, of the KCC overage through contingency line items in the DIP Budget, which materially exhausted these contingency line items.

[15] A few weeks prior to the Petition Date, HillStreet also demanded that in order to reduce professional fees the Debtors terminate Squire Sanders as their legal counsel and retain Mr. Lawrence Yumkas of the firm Yumkas,

reductions to executive compensation they successfully negotiated, again for HillStreet's benefit. As reflected in Getzler Henrich's monthly fee statements on file with the Court, the combination of voluntary reductions and capping of hours resulted in a reduction of fees in excess of $174,000 (approximately 26% of actual fees incurred) in the first fourth months of these Cases alone.

32.    The Debtors' and Committee's Professionals in these Cases also made significant postpetition concessions.  The Debtors had negotiated adequate DIP Financing from lenders other than HillStreet under which the Professionals (other than Getzler Henrich) would have been paid monthly and Getzler Henrich would have been paid weekly under an agreed upon budget.  In response to HillStreet's 11th hour decision to propose alternative financing and the Court's request that the parties attempt to reach a resolution that would avoid litigating a priming DIP, the Professionals made additional concessions for the benefit of HillStreet, the estates and all creditors in order for the Debtors to obtain the DIP Facility from HillStreet and to allow the sale process to proceed.  Specifically, with the time fast approaching when the Debtors would have been forced to close all of their locations if DIP financing was not obtained, the Professionals reluctantly consented (a) to reduce the DIP budget line item for professional fees through closing to $460,000 for all Professionals (less than 25% of actual fees incurred by all Professionals through May 31 alone), subject to the Debtors' right to seek a surcharge under section 506(c) of the Bankruptcy Code for any unpaid fees and expenses, and (b) then, to forgo all current pay under the DIP budget until the closing of the anticipated asset sales.  As a result, a substantial portion of the costs of these Cases have been financed by the Professionals for HillStreet's direct, primary and substantial benefit.

33.    The reservation of rights under section 506(c) was a critical component of the DIP

---

Vidmar, and Sweeney LLC (who now acts as counsel for HillStreet – HillStreet's third law firm in these Cases). The Debtors refused.

financing agreement with HillStreet, without which the Professionals would not have agreed to work.  Importantly, the Final DIP Order contains a limited section 506(c) waiver and a reservation of rights as to a surcharge.  Specifically, the limited 506(c) waiver relates only to the DIP Lender and the DIP collateral.  There is no section 506(c) waiver with respect to HillStreet in its capacity as prepetition secured lender or its prepetition collateral.  Moreover, the limited section 506(c) waiver (set forth in paragraph 7 of the Final DIP Order) is expressly subject to the reservation of rights under paragraph 9 of the Final DIP Order, which permits the Debtors and the Professionals to assert a surcharge under section 506(c) against the property securing the claims of HillStreet as both a DIP lender and prepetition lender for the amount of fees and expenses incurred by Professionals that exceeds the Professional Fee Cap (as defined in the Final DIP Order).  Final DIP Order, ¶ 9.[16]

34.    The extent of the foregoing financial accommodations is unprecedented in the collective experience of the Professionals.  Nonetheless, the Professionals acquiesced in order to enable the Debtors to obtain financing and move forward with their sale process, and to maintain the Debtors as a going concern and save approximately 1,200 jobs.  As such, HillStreet is truly the primary beneficiary of these financial accommodations.

35.    The administration of these Cases and the success of the sale process have directly, primarily and materially benefitted HillStreet.  The costs and expenses comprising the Surcharge are reasonable and they were necessary to preserving and improving the going concern value of HillStreet's collateral pending the sale and to disposing of HillStreet's collateral

---

[16] Pursuant to the DIP Order, the sequencing of payment of the Professionals' fees and expenses is as follows: first, Professionals must apply any retainers they may hold in payment of their allowed fees and expenses; second, allowed fees and expenses within the amounts set forth in the DIP Budget may be paid out of the $460,000 carve-out for such fees and expenses, which constitutes the "Professional Fee Cap"; and third, the Debtors and Professionals have the right to seek a surcharge for any fees and expenses exceeding the Professional Fee Cap.  Final DIP Order, ¶ 9.

for an aggregate purchase price far in excess of what HillStreet could have reasonably hoped to achieve on its own through other means, whether in a chapter 7 liquidation or multiple receiverships or foreclosure actions.  To avoid a windfall to HillStreet, the costs and expenses incurred to achieve these results must be paid.

## RELIEF REQUESTED

36.    The Debtors and the Committee respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit F, granting the Surcharge against HillStreet's collateral.  The Surcharge is comprised of the following (in the case of Professional fees and expenses, subject to the application of retainers and the $460,000 Professional Fee Carve-Out in the manner described below):

(i)    compensation and expense reimbursement for the Debtors' Chief Restructuring Officers totaling $528,497.72 (the "CRO Compensation");

(ii)    professional fees and expenses of the Debtors' legal counsel, Squire Sanders (US) LLP ("Squire Sanders"), which were incurred through the date of closing, incurred following the closing but relating to necessary post-closing sale matters, and that were otherwise caused by HillStreet totaling $915,366.29 (the "Debtors' Counsel Fees");

(iii)    professional fees and expenses of the Committee's retained Professionals, which were incurred through the date of closing, incurred following the closing but relating to necessary post-closing sale matters, and that were otherwise caused by HillStreet totaling $288,703.79 in the aggregate (the "Committee's Professional Fees"); and

(iv)    actual and necessary expenses that HillStreet has not funded under the DIP Facility totaling $84,206.02 (the "Unfunded DIP Expenses").

37.    A breakdown of the fees and expenses comprising each of the foregoing by category and amount are attached hereto as Exhibits B through D.  In addition, Squire Sanders and the Committee's Professionals have identified those fees and expenses for services they performed which may not have directly and primarily benefitted HillStreet and have voluntarily excluded those fees and expenses from the Surcharge request.  Those excluded fees and expenses

- 19 -

are identified in Exhibits B through D as well (the "Excluded Fees and Expenses").

38.     In addition, in accordance with the terms of their respective retention orders, the Professionals intend to apply their respective retainers and amounts under the Professional Fee Carve-Out, first, in payment of any allowed professional fees and expenses that are not subject to surcharge under section 506(c) (including, without limitation, the Excluded Fees and Expenses) and, second, in payment of amounts granted as a surcharge under section 506(c).   While the Professionals believe they are permitted to apply payments in this manner without further Court approval (there are no requirements to do otherwise in the Final DIP Order), out of an abundance of caution and in the interests of full disclosure, the Professionals respectfully request that the Court authorize such application of payments and the Professionals not be required to allocate any portion of a surcharge granted hereunder to any retainers or to the Professional Fee Carve-Out.   The application of retainers and the Professional Fee Carve-Out to all fees and expenses incurred through May 31, 2013 is set forth in detail in the chart attached hereto as Exhibit E. The Professionals have incurred and will continue to incur additional professional fees and expenses since May 31 which they will seek to satisfy through their respective retainers and the Professional Fee Carve-Out prior to applying the same to any fees and expenses for which a surcharge is sought.

## BASIS FOR RELIEF

39.     Section 506(c) of the Bankruptcy Code permits a debtor to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim … [.]"   11 U.S.C. § 506(c).   This section creates an express statutory exception to the general rule that a secured creditor is not responsible for paying the costs of administration of a bankruptcy case.

40.     The purpose of this exception is "to ensure that, any time a debtor in possession

- 20 -

'expends money to provide for the reasonable and necessary cost and expenses of preserving or disposing of a secured creditor's collateral, the … debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party.'" *General Electric Credit Corporation v. Levin & Weintraub (In re Flagstaff Foodservice Corporation)*, 739 F.2d 73, 76 (2nd Cir. 1984) ("Flagstaff I"), *citing* 124 Cong. Rec. H11089 (daily ed. Sept. 28, 1978) (Statement of Rep. Edwards), *reprinted in* 1978 U.S. Code Cong. & Ad. News 6436, 6451. The exception is also intended to prevent a secured creditor from receiving a windfall through the payment of expenses to preserve or dispose of the secured creditor's collateral by a third party, including other than by a trustee or debtor in possession. *Shaw, Licitra, Parente, Esernio & Schwartz, P.C. v. Travelers Indemnity Company (In re Grant Associates)*, 154 B.R. 836, 841 (S.D.N.Y. 1993) ("Preventing unsecured creditors from collecting for services which benefitted a secured creditor would give the secured creditor a windfall"); *In re Kohl*, 421 B.R. 115, 123 (Bankr. S.D.N.Y. 2009); *Rifken v. CapitalSource Finance, LLC (In re Felt Mfg. Co.)*, 402 B.R. 502, 510 (Bankr. D.N.H. 2009), citing *IRS v. Boatmen's First Nat'l Bank*, 5 F.3d 1157, 1159 (8th Cir. 1993); *In re Nutri/System, Inc.*, 1994 Bankr. LEXIS 382, at *22 (Bankr. E.D. Pa. Mar. 23, 1994).

41.    The test for meeting the requirements for a surcharge under section 506(c) is well-settled in this Circuit: (1) the services rendered must be necessary to preserve or dispose of the property; (2) the amounts charged must be reasonable; and (3) the funds must be expended primarily for the benefit of the creditor and the creditor must have directly benefited from the expenditure. *Flagstaff I*, at 76; *General Electric Credit Corporation v. Peltz (In re Flagstaff Foodservice Corporation)*, 762 F.2d 10, 12 (2nd Cir. 1985) (Flagstaff II); *Omni Partners, L.P. v. Pudgie's Dev. of NY, Inc. (In re Pudgie's Development of NY, Inc.)*, 239 B.R. 688, 697 (S.D.N.Y.

CINCINNATI/99443

1999); *In re 652 West 160th LLC*, 2008 Bankr. LEXIS 807, *5-6 (Bankr. S.D.N.Y. 2008); *In re Campbell Mills, Inc.*, 1994 Bankr. LEXIS 1854, *6 (Bankr. S.D.N.Y. 1994); *In re McLean Industries, Inc.*, 84 B.R. 340, 350 (Bankr. S.D.N.Y. 1988).

42.    Alternatively, a secured creditor can be charged for administrative costs and expenses if it expressly or impliedly consented to them, including by causing such expenses to be incurred.  *Pudgie's Development*, 239 B.R. at 697-698; *In re Croton River Club, Inc.*, 162 B.R. 656, 659 (Bankr. S.D.N.Y. 1993); *In re Trim-X, Inc.*, 695 F.2d 296 (7th Cir. 1982).

43.    Under the foregoing standard, section 506(c) permits a surcharge to recover attorney and other professional fees, whether incurred by a debtor or a creditors committee.  *See, e.g., In re Grant Associates*, 154 B.R. 836 (S.D.N.Y. 1993) (granting surcharge for debtor's attorney fees); *In re Croton River Club, Inc.*, 162 B.R. 656 (Bankr. S.D.N.Y. 1993) (same); *In re Stable Mews Associates*, 49 B.R. 395 (Bankr. S.D.N.Y. 1985) (granting surcharge for attorney fees to chapter 11 trustee who served a dual capacity of trustee and its own legal counsel); *Rifken v. CapitalSource Finance, LLC (In re Felt Mfg. Co.)*, 402 B.R. 502, 527 (Bankr. D.N.H. 2009) ("The complaint states a plausible entitlement to a surcharge for the fees and expenses of the Committee's professionals."); *In re Nutri/System, Inc.*, 1994 Bankr. LEXIS 382, at *22 n. 4 (Bankr. E.D. Pa. Mar. 23, 1994) ("The [landlords'] authority to invoke § 506(c) is beyond dispute.").

44.    Generally, the case law establishes that a secured creditor's collateral is surcharged where attorney fees are incurred to preserve and improve the value of the secured creditor's collateral.  For example, in *Grant*, the debtor's sole asset was a commercial property known as the Grant Building which served as collateral for a $7 million note.  The debtor defaulted under the note but an involuntary chapter 11 case was commenced by the debtor's

CINCINNATI/99443

general partner before the secured creditor could foreclose on the property. Ultimately, the automatic stay was lifted to allow the secured creditor to foreclose on the Grant Building. Following the foreclosure, the debtor's legal counsel sought a surcharge under section 506(c) for its legal fees and expenses, which the bankruptcy court granted for services relating to "the administration" of the Grant Building, the collection of rent from a tenant and preparing and filing a fee application for its services. *Grant*, 154 B.R. at 842.

45. In analyzing the benefits conferred on the secured creditor on appeal, the district court stated that "[a]ny service necessary to maintain the value of the building or increase the amounts of the rents and deposits would have directly benefited [the secured creditor]." *Id*. The court reasoned that:

> … attorneys' fees expended for the administration of the Grant Building and those expended for collecting rents could plausibly have benefitted [the secured creditor]. Had the Grant Building not been fully maintained while it was under [the debtor's] control, [the secured creditor] would have received something of lesser value than it did upon foreclosure. Likewise, the rent collected from one of the tenants of the Grant Building … added to the net sum of rents and deposits turned over to [the secured creditor]. Since none of this work would have been done without the possibility of compensation, [the attorney's] fee application could be considered an integral component.

*Id*. In other words, the debtor's legal counsel in that case had conferred a direct and primary benefit on the secured creditor because it preserved and increased the value of the collateral and the amount ultimately realized by the secured creditor. Even the fees for preparing and filing a fee application relating to those services were subject to the surcharge because the beneficial services would not have been done without the possibility of compensation. *Id*.

46. The court in *Croton River Club*, 162 B.R. 656 (Bankr. S.D.N.Y. 1993), applied similar reasoning in granting the debtor's legal counsel a surcharge under section 506(c). The

- 23 -

case is particularly instructive because it is analogous to these Cases and the instant request for

the Surcharge.  In *Croton River Club*, the debtor owned a mixed-use real estate development

consisting of a parcel of land dedicated to future residential development, an adjoining boat

marina, and land dedicated to the construction of a restaurant.  The marina and the restaurant

parcel secured a $6.8 million loan.  The debtor commenced a chapter 11 case during which it

sought to sell the marina and restaurant parcel and the debtor's counsel, among other things,

negotiated with potential bidders and provided services relating to the day to day operation of

those parcels.  Ultimately, the case was converted to a chapter 7 case and the collateral was sold

through an auction.

47.     The debtor's counsel (Kaye Scholer) sought a surcharge under section 506(c) for

its pre-conversion services which focused on preserving and improving the value of the collateral

pending a sale.  In particular, Kaye Scholer argued it conferred a direct and primary benefit on

the secured creditor by negotiating a stipulation for the use of cash collateral and successfully

increasing the sales value of the marina through litigating a reduction in the operating expenses

for the entire real estate development that were otherwise allocable to the marina as a result of

existing agreements.

48.     The bankruptcy court agreed that these were primary and direct benefits under

section 506(c).  The cash collateral stipulation allowed the marina to operate as a going concern,

which in and of itself was a sufficient benefit for purposes of section 506(c).  *Croton River Club*,

162 B.R. at 659-660, *citing Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel

Castings Co.)*, 799 F.2d 91, 94 (3rd Cir. 1986) ("The definition of benefit encompasses more

than the bottom line of a balance sheet.  Preservation of the going concern value of a business

can constitute a benefit to the secured creditor.").  Furthermore, the bankruptcy court found that,

- 24 -

in addition to meeting the benefit test, the secured creditor had also impliedly consented to the payment of fees associated with the cash collateral stipulation because the stipulation did not give the creditor a superpriority interest. *Id*. at 660.[17]

49.    In addition, the reduction in operating expenses turned the marina from an asset that was not saleable into an asset that was saleable. *Id*. The marina would have had a negative cash flow which would have "manifestly chilled any bona fide bidding for the Marina by potential purchasers. Not only was this fact not contested by the [secured creditor], but indeed it was the [secured creditor's] own position 'that any material alteration in the marina budget allocation could destroy the value of the marina as a saleable asset.'" *Id*. at 660. The court explained further:

> Clearly, the Marina was not saleable prior to the successful representation of the debtor by Kaye, Scholer in the Allocation Litigation. Therefore, since prior to the Allocation Litigation the Marina could not be sold, its collateral value to the [secured creditor] was zero. However, after the litigation, the Marina sold for $715,000 and consequently the [secured creditor] was benefitted by Kaye, Scholer's representation to the extent of $715,000. Thus, the [secured creditor] was benefitted within the guidelines of Flagstaff I and therefore Kaye, Scholer is entitled to collect reasonable fees for the services rendered from the value of the [secured creditor's] collateral.

*Id*. Just as in *Grant*, the court in *Croton River Club* found that services which maintained value (ensuring access to cash collateral to keep the asset operating as a going concern) and improved value (turning the marina from an asset the secured creditor believed had zero value into a saleable asset) constituted primary and direct benefits to the secured creditor for purposes of section 506(c).

---

[17] The same is true in these Cases. While the DIP Facility granted HillStreet a superpriority claim, the Final DIP Order expressly provides for a reservation of rights with respect to a section 506(c) surcharge. Thus, there could not have been any expectation by HillStreet that it would have the benefit of a superpriority ahead of costs and expenses incurred within the ambit of section 506(c).

50.     Finally, in *Stable Mews*, 49 B.R. 395 (Bankr. S.D.N.Y. 1985), a chapter 11 trustee serving as its own legal counsel sought to surcharge the sale proceeds of a commercial building that had served as collateral for a first and second mortgage for its legal fees (among other things).  The trustee engaged in litigation with the building's tenants in connection with lease rejection and rent matters and commenced an extensive sale process resulting in a robust auction and a sale price sufficient to satisfy the first mortgage but not the second.  The court found that the trustee conferred a direct and primary benefit for purposes of section 506(c) because, among other things: (i) the results of the tenant litigation were instrumental to the auction; (ii) the trustee maintained the building and preserved the opportunity to sell it a price exceeding that of the first mortgage; and (iii) the trustee negotiated a stalking horse "floor bid" and encouraged further inquiries and bids from other interested parties.  *Stable Mews*, 49 B.R. at 405.

51.     As demonstrated below, the requested Surcharge reflects amounts that were reasonable and necessary to preserve and improve the value of the Flat Top Grill and Stir Crazy Assets pending the auction and sale, and that primarily and directly benefitted HillStreet. Furthermore, a substantial portion of the amounts reflected in the Surcharge were caused by HillStreet through, among other things, (i) its excessive opposition to cash collateral and financing matters, (ii) the dispute with the PACA trust creditors which was a direct offshoot of HillStreet's refusal to segregate funds for their benefit, and (iii) various post-closing sale matters including the HillStreet – Vogen transaction.  Thus, the Debtors and the Committee have satisfied the requirements for a surcharge under section 506(c).

## I.   HillStreet has Received a Direct and Primary Benefit

52.     As set forth above, no party has benefitted more from these cases and the success of the sale process than HillStreet.  Through the efforts of the Debtors, the Committee, and the

- 26 -

Professionals, the going concern value of the Flat Top Grill Assets and the Stir Crazy Assets was preserved and improved, which allowed a fulsome auction and sale process to occur. Instead of salvaging a few stores worth $4.2 million[18], as HillStreet projected, the Debtors were able to generate an aggregate purchase price in excess of $10 million and a net recovery for HillStreet of approximately $6,722,000. This purchase price resulted in a recovery to HillStreet that (i) paid in full all postpetition DIP financing obligations to HillStreet totaling approximately $914,000; (ii) paid in full all of HillStreet's prepetition senior secured debt totaling $1,250,000; and (iii) paid approximately $4,558,000 of HillStreet's $5 million in principal amount of prepetition junior secured debt. As described in detail above, this recovery is far superior to any recovery HillStreet could have achieved through alternative means. Through these efforts, HillStreet received a direct and primary benefit. *See, e.g., In re Lunan Family Restaurants Limited Partnership*, 192 B.R. 173 (Bankr. N.D. Ill. 1996) (secured creditor received a direct and primary benefit through the payment of operating expenses necessary to preserve the going concern value of a restaurant chain pending a sale in chapter 11); *In re Strategic Labor, Inc.*, 467 B.R. 11 (Bankr. Mass. 2012) (secured creditor surcharged for reasonable and necessary expenses incurred for its primary benefit in connection with the sale of a debtor's business as a going concern where the sale resulted in a recovery by the secured creditor "exponentially greater" than what it could have hoped to achieve through a forced liquidation of collateral).

53.    The *Lunan* case is especially instructive as many of its key facts mirror the facts here. The *Lunan* case involved a Chicago restaurant chain that sold its stores as a going concern in chapter 11 and the debtor's request to surcharge the sale proceeds distributed to the debtor's secured creditor "for obligations that Debtor incurred while preserving the Bank's collateral and enabling the sale of restaurants to be made from an ongoing business rather than forced

---

[18] Again, as explained above, this number is artificially inflated and based upon faulty assumptions.

liquidation." *Lunan*, 192 B.R. at 175.  As in these Cases, the secured creditor in *Lunan* expressly did not consent to a section 506(c) surcharge and was not paid in full through sale proceeds, which were only sufficient to pay certain administrative claims and a portion of the secured creditor's prepetition debt.  *Id*. at 183.  Among other things, the debtor sought a surcharge for unpaid utilities, rent, and health insurance claims of employees.  The court found that those operating costs and expenses conferred a primary and direct benefit on the secured creditor in that case because they allowed the restaurants to continue being operated as a going concern, thereby maximizing the value and ultimate sale proceeds generated from the sale.  *Id*. at 179-180.

54.     Many of the restaurants in *Lunan* were operated under leases which the secured creditor valued as having little, if any, value.  *Id*.  The court found that the increased sale price for realized by the secured creditor as a result of the payment of rent and other operating expenses conferred a primary and direct benefit on the secured creditor.  *Id*.  The higher sale price was "an amount it would not have received had those restaurants not been kept open."  *Id*. at 180.

55.     Similarly, the increased sale price for a restaurant that was owned rather than leased was "the result of good marketing, which only was possible because the lights were on and employees were working to keep the restaurants functioning."  *Id*.  The individual hired by the debtor to facilitate the sale of the restaurants testified regarding the significant price difference "between a restaurant sold in operating condition, "lights on", and a restaurant that is sold while closed."  *Id*.

> …selling restaurant properties in a "lights on" condition allows prospective purchasers to witness the operation of a restaurant, inspect the quality of the equipment under working conditions, and analyze the patrons in terms of number and demographics.  Closed restaurants do not allow prospective purchasers the opportunity to assess these conditions, which generally lowers their bids in the

- 28 -

> face of greater uncertainties. Closed restaurants are generally
> perceived to be available at "fire sale" prices and the owners to be
> in dire need of funds. Claimants proved that they were able to
> obtain higher prices for all the sold restaurants because they were
> sold as going concerns.

*Id*. The Court reasoned further that if the secured creditor had foreclosed on its collateral on its

own, it would have "been faced with foreclosing costs and most of the operating costs involved

here if it then sought to realize going concern value. Here the Bank saved all these costs and was

directly benefited because the Debtor incurred most charges claimed here by keeping the

restaurants open." *Id*. The Court also found those expenses to be necessary to operate the

business and reasonable. *Id*. To be sure, the Court found that other expenses not necessary to

keep the lights on did not confer a primary or direct benefit and denied the surcharge request for

those limited expenses. But, for those expenses that were incurred that were necessary to keep

the lights on, a primary and direct benefit had been conferred on the secured creditor through the

increased sale price that was only obtainable through continued operation of the restaurants. *Id*.

56.      In addition to preserving and maximizing the value of HillStreet's collateral, the

specific benefits to HillStreet include, among other things, (i) the substantial improvements to

the Debtors' business operations and profitability across the board which made the Company as a

whole more saleable and attractive to potential bidders; (ii) obtaining access to cash collateral

and adequate financing to keep the lights on and to fund the sale process; (iii) addressing day to

day operational, financial and administrative matters necessary to operate as a going concern in

chapter 11, (iv) successfully litigating the dispute with the PACA trust creditors regarding the

need to segregate funds in advance of the sale closing; and (v) conducting an extensive sale and

auction process, each of which is discussed below.

57.      <u>Business Operations</u>.  The Chief Restructuring Officers, who were retained under

section 363 of the Bankruptcy Code, have had primary responsibility over every aspect of the Debtors' day to day business operations. Indeed, Mr. Samson was dedicated to the Debtors on a full time basis. As described above, they conducted an extensive analysis of the Debtors' operations and took immediate steps to reduce the cost burden and negative cash flow of the Company, including through closing unprofitable stores and rejecting executory contracts and unexpired real property leases, raising menu pricing at the Stir Crazy locations, and negotiating with senior management to reduce exorbitant salaries.

58. They obtained the support of regional and store managers and key employees, reaching out to them through personalized correspondence, direct communication, and site visits. In particular, Mr. Samson reviewed the operations for each store location with regional managers, personally met with most Stir Crazy store managers, conducted regular status calls with managers to keep them abreast of the sale process and the Cases, and counseled managers about how to answer customer and employee questions concerning the bankruptcy cases. The Chief Restructuring Officers also obtained court approval of a critical bonus program for management and employees, without which the Debtors risked losing key store managers for profitable locations.

59. They obtained the support of vendors and landlords keeping them informed regarding the anticipated sale process and the status of trade payables and, more importantly, ensuring continued supply and service to the store locations.

60. The Chief Restructuring Officers were also engaged in every aspect of the Cases themselves and obtaining critical relief, such as access to cash collateral and DIP financing. Among other things, they ran the process for soliciting DIP financing proposals, undertook necessary budgeting and forecasting, and complied with numerous financial reporting requirements owed to HillStreet in connection with using cash collateral and under the Final DIP

- 30 -

Order.  In particular, each week, Mr. Samson prepared and reviewed a detailed actual vs. budget report with Mr. Perrazo of HillStreet, providing necessary explanation for any material variances.

61.    With respect to the sale process, among other things, they facilitated due diligence, evaluated bids, negotiated a stalking horse agreement with Victory Park, qualified bidders, conducted the auction, and attended to closing and post-closing matters.

62.    The foregoing efforts were necessary to preserving and maximizing the going concern value of the Debtors' assets pending the auction and sale, thereby directly and primarily benefiting HillStreet.

63.    <u>Cash Collateral and Financing</u>.  It goes without saying that the sale process and the maintenance of the Debtors' restaurant chains as going concerns could not have occurred without access to cash collateral and adequate financing.  As discussed above, obtaining access to cash collateral and adequate financing constitutes a surchargeable benefit under section 506(c).  *Croton River Club*, 162 B.R. at 659-660.  The effort to obtain financing was fraught with difficulty and involved the negotiation of three proposed financing arrangements and court orders with three separate lenders, as well as an entire asset purchase agreement with one of the lenders who served as a stalking horse purchaser, all over the course of a single week.[19]  At the same time, the Debtors and their Professionals had to defuse threats from HillStreet to seek to convert the Cases to chapter 7 – an action which would have had disastrous consequences on the sale process the Debtors intended to pursue and the value of their assets.

64.    Prior to the Petition Date, the Debtors had received a financing proposal from HillStreet[20] which, for the most part, they were willing to accept as originally proposed.  The

---

[19] The Debtors and the Committee also negotiated a possible fourth financing agreement with yet another possible DIP lender prior to the Victory Park financing proposal.

[20] The Debtors had solicited proposals from U.S. Bank National Association (the Debtors' then senior secured lender whose debt was subsequently assigned to HillStreet), HillStreet, and existing equity holders and other

Debtors and their Professionals used their best efforts to reach a final agreement with HillStreet and to address subsequent changes that Hillstreet made to its proposal, including with respect to the payment of professional fees.  Ultimately, these efforts were unsuccessful, HillStreet advised the Debtors of its intention to commence a receivership, and the Debtors were compelled to commence these Cases without a financing agreement in place.  Instead, the Debtors sought immediate access to cash collateral in order to operate and maintain the value of their assets (and HillStreet's collateral) during the first five weeks of the Cases and to have sufficient time to locate alternate financing.

65.    HillStreet did not oppose the use of cash collateral, but objected to any carveout for the payment of professional fees to be incurred by the Debtors or the Committee, U.S. Trustee fees and any chapter 7 trustee fees.  The Court granted interim approval to use cash collateral without ruling on HillStreet's carveout objection, and advised the parties to use their best efforts to reach an agreement with respect to a mutually acceptable carveout in advance of a hearing to approve the use of cash collateral on a final basis.

66.    The unreasonableness of HillStreet's objection to the payment of professional fees was directly addressed by the Court on the record at the February 19, 2013 hearing:

> Court:  I understand you're concerned about the professional fees; that's a legitimate concern, clearly.  On the other hand, nothing in life is for free, particularly foreclosing on collateral.  All right? Who's to say I should even keep it in [chapter] 7, if you want it in [chapter] 7?  Why don't you just go out and deal with it in thirty-six foreclosure actions?  Think about that.
>
> Mr. Schueller:  Understood, judge.

---

investors.  Of this group, HillStreet was the only one who provided an initial proposal on reasonable terms.  Given the fact that financing from any other source would have necessarily involved the priming of HillStreet's liens, the Debtors ceased trying to locate alternate proposals, and focused on finalizing what they expected would be a consensual deal with HillStreet.

- 32 -

Court:  All right.  In the meantime, I think this should be extended with a full reservation of rights, including in respect to 506(c) – which I don't want to belittle either way.  The test is clear under the *Flagstaff* cases, and depending on [the] results of the auction, it may well be met.  But, I think, before we go down farther on this road, I should have a hearing under 363(c) and 361 and see whether the work that's going to be done is, in essence, like keeping the collateral insured, like keeping the lights on, et cetera.

February 19, 2013 Hearing Transcript, Pg. 59, Lines 7-22.

67.    The Debtors complied with numerous financial reporting requirements under the cash collateral order in favor of HillStreet as they solicited and evaluated financing proposals from numerous lending sources, including from potential bidders in connection with the Debtors' efforts to sell their Flat Top Grill assets.  Among the proposals considered were another proposal from HillStreet (which the Debtors were agreeable to but which HillStreet subsequently withdrew) and a proposal from Vogen (which was on terms not acceptable to the Debtors). Ultimately, the Debtors, in consultation with the Committee, selected and sought approval of a financing proposal from Victory Park, which the Debtors believed was the best financing alternative available at the time.  Among other things, the financing would have provided the Debtors with up to $2.5 million in financing and was linked with an obligation to designate Victory Park as the stalking horse purchaser for the Debtors' Flat Top Grill assets (which would have guaranteed a minimum cash purchase price of $4 million for those assets).

68.    In less than three days, the Debtors and their Professionals, along with the Committee and its Professionals, negotiated a DIP financing order and a final executed asset purchase agreement with Victory Park (a formal credit agreement was not required) and promptly sought approval of the proposal from the Court.  Shortly before the hearing, however, HillStreet and Vogen objected to the Victory Park proposal.  Vogen argued that it was able to provide financing on equal or better terms than Victory Park (notwithstanding the fact that its

- 33 -

prior proposals had fallen far short), and HillStreet argued that a conversion to chapter 7 was the best way to proceed.  In light of these eleventh hour developments, the Court recommended that the Debtors negotiate with Vogen to obtain financing on the best possible terms.

69.    Over the next twenty four hours, the Debtors and the Committee negotiated an agreement and a revised financing order with Vogen, for which the Debtors sought approval the following afternoon.  However, once again, minutes before the hearing on February 28, 2013 to consider approval of the Vogen proposal, HillStreet objected, arguing that it was able to provide financing on equal or better terms than Vogen.  This led to intense negotiations with HillStreet lasting late into the night.  The Court was advised at the hearing that, without Court approval on February 28, 2013 (a Thursday) of adequate financing, the Debtors had no choice but to go dark, lest they incur obligations which could not be paid.  Thus, unless the Debtors were able to reach an agreement and obtain immediate access to financing, the Debtors would close their doors and "go dark" the following morning.

70.    As a result of these negotiations with HillStreet and the economic realities of "going dark", a number of difficult compromises were reached, including, among other things, with respect to (a) the amount of financing to be provided, (b) the sale of the Debtors' Stir Crazy assets and the timing of the sale process in general, and (c) an agreement by the Professionals to a significantly reduced professional fee carveout and the deferral of any payment of professional fees until the closing of the anticipated asset sales (subject to the rights of Professionals to assert surcharge claims under section 506(c) of the Bankruptcy Code).  The 506(c) reservation of rights was a critical component of the agreement with HillStreet and was relied upon by the each of the Professionals in proceeding with the sale process for HillStreet's benefit.  As a result of these efforts, the Debtors and HillStreet were able to reach a final financing agreement which was

- 34 -

orally approved on an interim basis that very night by the Court.

71.    PACA Dispute.  The resolution with HillStreet, however, gave rise to another significant dispute – this time with creditors asserting PACA trust claims.  Under the agreement with HillStreet, rather than immediate segregation of funds for the benefit of PACA creditors, the payment of PACA claims would be deferred and paid from the first dollars generated from the Debtors' asset sale which would be funded and segregated immediately upon closing of the sale.[21]  This was inconsistent with a prior deal the PACA creditors had discussed with the Debtors and Victory Park.

72.    The Debtors, the Committee, and their Professionals went to great lengths to try to resolve the dispute between the PACA creditors and HillStreet absent court intervention, but these efforts were unsuccessful.  The Debtors sought approval of the HillStreet financing on a final basis over the objections of the PACA creditors, which the Court granted.  Had the PACA creditors prevailed, however, the Debtors would not have had the necessary funds to segregate for the PACA creditors.  This would have been compelled the Debtors to "go dark" and likely commence a liquidation.  Thus, similar to the tenant litigation in *Stable Mews*, the PACA litigation was essential to proceeding with the sale process.

73.    The Sale Process.  With the assistance of the Professionals, the Debtors, in consultation with the Committee, obtained court approval of the necessary bidding procedures for the asset sale and proceeded with marketing the assets and soliciting bids from potential purchasers.  This process is set forth in detail in the Hill Sale Affidavit.

74.    The Debtors, the Committee and the Professionals spent significant amounts of

---

[21] Initially, HillStreet had advised the Court on the record that it would mirror what Vogen had proposed with respect to the PACA claims.  Feb. 28 Hearing Tr., pg. 36, lines 7-8.  HillStreet retreated from this position during subsequent negotiations.

time working with all of the potential bidders, reviewing and evaluating bids, negotiating the terms of various asset purchase agreements and ultimately conducting a marathon auction. Once HillStreet was selected as the successful bidder for all of the Assets, the Professionals worked diligently on the documentation necessary to consummate the transactions. Moreover, the Debtors obtained approval of the sale over the vigorous objection of Vogen, which involved complex issues concerning the nature of the Debtors financing agreements with Vogen and the ability to sell the assets free and clear of Vogen's liens under section 363 of the Bankruptcy Code. The sales closed on May 2, 2013.

75.     Committee's Professional Fees.[22]   The Committee's objective from the outset was to maximize the value of the Debtors' assets, and generate recoveries for general unsecured creditors above and beyond those amounts payable to HillStreet as the Debtors' secured lender. A creditors' committee is required in chapter 11 and the sale of the Debtors' assets as a going concern could not have been achieved without the Committee's participation and meaningful contribution to these Cases. Up to the value of HillStreet's secured claim, the Committee's and HillStreet's interests in maximizing the value of the Debtors' assets were aligned completely. At several important junctures in these Cases, the Committee and HillStreet had common objectives. For example, the Debtors initially proposed to sell only the Flat Top Grill chain. The Committee joined with HillStreet to persuade the Debtors to sell the Stir Crazy chain on the same timeline as

---

[22] Creditors' committees are entitled to surcharge a secured creditor's collateral. *See, e.g,. In re Grant Assocs.*, 154 B.R. 836, 841 (S.D.N.Y. 1993) ("Preventing unsecured creditors from collecting for services which benefitted a secured creditor would give the secured creditor a windfall."); *Rifken v. CapitalSource Finance, LLC (In re Felt Mfg. Co.)*, 402 B.R. 502, 527 (Bankr. D.N.H. 2009) ("The complaint states a plausible entitlement to a surcharge for the fees and expenses of the Committee's professionals."); *In re Nutri/System, Inc.*, 1994 Bankr. LEXIS 382, at *22 n.4 (Bankr. E.D. Pa. Mar. 23, 1994) ("The [landlords'] authority to invoke § 506(c) is beyond dispute."); *In re Croton River Club*, 162 B.R. 656, 664 (Bankr. S.D.N.Y. 1993) ("[A] secured creditor who received a direct benefit from the rendition of services or provision of goods by an administrative claimant of the estate should have the collateral charged for such benefit, regardless of whether the proceeds of such charge are paid to the debtor, debtor in possession or trustee as reimbursement for its prior payment to the claimant or are paid to the claimant directly.").

CINCINNATI/99443

Flat Top Grill to ensure efficiencies and maximize recoveries.  The result was a streamlined and successful sale process that directly and indisputably benefited HillStreet.

76.    Additionally, shortly after its appointment, the Committee worked directly with Mr. Perrazo and HillStreet's counsel to explore the viability of a private sale to HillStreet.  The prospect of the private sale was proposed by HillStreet as an alternative to proceeding with an auction in chapter 11, a sale under chapter 7, or a sale through a series of state court receiverships.  While the Committee would not agree to support a private sale under the circumstances, these discussions ultimately contributed to the parties' agreement to add the Stir Crazy restaurant chain to the existing sale process for Flat Top Grill.

77.    The Committee could have approached these Cases in a far different manner.  With little to lose, creditors' committees in similar situations often adopt hostile, scorched-earth litigation strategies.  Here, the Committee played a key role in preserving and maximizing the value of the Debtors' assets.  Although there were limited tasks undertaken by the Committee that did not benefit HillStreet, such as the Committee's investigation of HillStreet's liens and claim, the Committee is not seeking to surcharge HillStreet for such costs.[23]

78.    In sum, the Committee played an integral role in keeping the Debtors' operations from going dark, all to the ultimate (and effectively exclusive) benefit of HillStreet.  Unfortunately, the values generated by the sales were insufficient to fully satisfy HillStreet's

---

[23] Despite identifying colorable claims, the Committee elected not to challenge HillStreet's prepetition liens and claim prior to the June 17, 2013 challenge deadline under the Final DIP Order.  The Committee's investigation of HillStreet's prepetition liens revealed that HillStreet did not hold valid, enforceable, and perfected first priority liens on, among other assets, the Debtors' leasehold interests, fixtures, and certain cash deposit accounts utilized by the Debtors as of the Petition Date.  Moreover, because HillStreet lacked a complete collateral package, HillStreet's liens did not extend to the Debtors' full enterprise and going concern values.  However, the size of HillStreet's prepetition secured claim and postpetition secured claim under the DIP Facility, the amount of section 503(b)(9) claims, the cost associated with soliciting and confirming a plan and conducting claims reconciliation together with the costs and uncertainty associated with lengthy and protracted litigation, led the Committee to conclude that it was highly unlikely that sufficient value would remain to provide a return to unsecured creditors.

secured claim and provide a recovery to general unsecured creditors.  This does not, however, mean that the Committee's efforts weren't reasonable, necessary, and directly beneficial to HillStreet.  On the contrary, these efforts and the attendant value realized directly benefitted HillStreet as the only prepetition creditor (other than the PACA creditors) to recover from the Debtors' estates.

## II.  The Services were Necessary and Reasonable

79.     The services and expenses were reasonable and necessary in order to preserve and improve the going concern value of the business and to conduct a fulsome sale process.

80.     For purposes of surcharging professional fees under section 506(c), reasonableness is determined with reference to the standards generally applicable to retained professionals under section 330 of the Bankruptcy Code.  *Grant*, 154 B.R. at 843; *Stable Mews*, 49 B.R. at 398.  When determining reasonableness under section 330, a court should review all relevant factors  including the following criteria: (a) the time spent on such services; (b) the rates charged for such services; (c) whether the services were necessary to administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under the Bankruptcy Code; (d) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (e) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and (f) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in the cases other than cases under the Bankruptcy Code.  *In re Value City Holdings, Inc.*, 436 B.R. 300, 304-305 (Bankr. S.D.N.Y. 2010).

81.     The time spent and applicable hourly rates of the Chief Restructuring Officers,

- 38 -

Squire Sanders, and the Committee's Professionals in these Cases are set forth in detail in exhibits B – D.  These fees do not include time spent on tasks that did not primarily and directly benefit HillStreet.

82.     The services performed were necessary to enable the Debtors to continue operating as a going concern and to maximize the value of HillStreet's collateral through the sale process.[24]  The Professionals staffed these Cases very judiciously and were focused on running an efficient sale process.   These Cases involved complex issues requiring a high degree of expertise, including the resolution of PACA trust issues, customer privacy issues, landlord lien rights, financing vs. true lease issues, and issues involving the Court's ability to sell free and clear of liens under section 363(f)(3) and (f)(5) of the Bankruptcy Code.  The representation as a whole was undesirable, especially given the disputes with HillStreet concerning professional fees and the extent to which Professionals have had to rely on the right to seek a surcharge under section 506(c) of the Bankruptcy Code in order to get paid.

83.     Finally, the fees reflect voluntary rate reductions by the Professionals and the capping of fees by the Chief Restructuring Officers.

84.     Accordingly, the costs and expenses comprising the Surcharge are reasonable and necessary.

---

[24] HillStreet is expected to argue that an expense can only be "necessary" under section 506(c) if there is equity in the collateral for the benefit of the bankruptcy estate based upon a "general rule" enunciated by the bankruptcy court in *First Services Group, Inc. v. O'Connell (In re Ceron)*, 412 B.R. 41, 48 (E.D.N.Y. 2009).  However, the *Ceron* case is distinguishable and is of no precedential value to these Cases.  *Ceron* was a chapter 7 case where a first lien lender obtained stay relief to foreclose on a piece of real property through a state court proceeding.  Thus, aside from not being controlling precedent, the facts in Ceron bear no resemblance to the facts before this Court and, given how fact intensive a surcharge analysis under section 506(c) is, the case is simply irrelevant.  Moreover, it is inconsistent with other cases that have granted a surcharge under section 506(c) even where sale proceeds have been insufficient to pay the secured creditor in full.  See, e.g., *In re Lunan Family Restaurants Limited Partnership*, 192 B.R. 173 (Bankr. N.D. Ill. 1996).

CINCINNATI/99443

### III. HillStreet's Own Actions Caused Certain of the Fees and Expenses

85.    Alternatively, certain fees and expenses included in the Surcharge request were also caused by HillStreet's own actions and thus can be surcharged under section 506(c) of the Bankruptcy Code regardless of whether such fees and expenses primarily and directly benefited HillStreet.  In particular, the Debtors were forced to respond to multiple objections by HillStreet with respect to cash collateral and debtor in possession financing.  For all of its opposition to high professional fees, HillStreet spared no expense in multiplying these proceedings through its excessive and unnecessary objections.  Had HillStreet agreed to provide financing on reasonable terms at the outset, rather than pursuing its objections to professional fees and threats to convert the Cases to chapter 7, the Debtors and the Committee could have avoided incurring significant professional fees, including the costs resulting from the solicitation of numerous potential lenders and ultimately the negotiation of three separate DIP financing arrangements with three different lenders.  Unfortunately, HillStreet seemed willing to negotiate only when it realized that the Debtors could obtain adequate financing, a priming lien was a likely outcome, and all other avenues had been closed.  In total, counsel for the Debtors incurred approximately not less than $117,637.80 and counsel for the Committee incurred approximately not less than $74,612.85 in professional fees in connection with obtaining financing and responding to HillStreet's objections.  The specific time entries comprising these amounts are included in Exhibits C (for Squire Sanders) and D (for Kelley Drye).

86.    Similarly, HillStreet's refusal to segregate funds for PACA creditors caused the Debtors to incur substantial professional fees in connection with efforts to negotiate a mutually acceptable resolution with the PACA creditors (which ultimately failed) and litigating the matter before the Court.  The dispute with the PACA creditors was forced upon the Debtors as a result

- 40 -

of HillStreet's refusal to segregate funds. In total, counsel for the Debtors incurred not less than $35,875.20 and counsel for the Committee incurred not less than $1,044.00 in professional fees as a result. The specific time entries comprising these amounts are included in Exhibits C (for Squire Sanders) and D (for Kelley Drye).

87.    Finally, HillStreet caused the Debtors to incur fees and expenses for certain post-closing matters. Among other things, HillStreet negotiated an agreement with Vogen in resolution of a number of issues, including the allocation of the purchase price for the Assets attributable to Vogen's collateral, and that involved the assignment of certain Vogen claims to HillStreet. The Debtors were required to review and consent to the agreement between HillStreet and Vogen and to agree to make certain payments. In addition, in connection with the funding of final amounts under the DIP Facility, HillStreet was not willing to fund the Debtors' total funding request and required the Debtors to spend significant amounts of time resolving their dispute with HillStreet regarding amounts that were appropriately included in the final funding request. In doing so, counsel for the Debtors incurred not less than $33,571.95 and counsel for the Committee incurred not less than $5,533.17 in professional fees and expenses. The specific time entries comprising these amounts are included in Exhibits C (for Squire Sanders) and D (for Kelley Drye).

## NOTICE

88.    Notice of this Motion has been provided to: (a) counsel to the Committee; (b) the Office of the United States Trustee for the Southern District of New York; (c) counsel to HillStreet; (d) counsel to Vogen Funding, L.P., and (e) all parties who have filed Rule 2002 notices and receive automatic notice in these Cases through the Court's ECF System. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

CINCINNATI/99443

## NO PRIOR REQUEST

89.     No prior request for the relief sought in this Motion has been made to this Court

or any other court in connection with these Cases.

**WHEREFORE**, the Debtors and the Committee respectfully request that the Court enter

an order, substantially in the form attached hereto, granting the relief requested herein and

granting such other and further relief as the Court deems just and proper.


Dated:  July 19, 2013                     Respectfully submitted,

                                          /s/ *Stephen D. Lerner*
                                          Stephen D. Lerner
                                          Elliot M. Smith
                                          Kristin E. Richner
                                          Andrew M. Simon
                                          SQUIRE SANDERS (US) LLP
                                          30 Rockefeller Plaza
                                          New York, NY 10112
                                          (212) 872-9800 (Phone)
                                          (212) 872-9815 (Fax)
                                          stephen.lerner@squiresanders.com
                                          elliot.smith@squiresanders.com
                                          kristin.richner@squiresanders.com
                                          andrew.simon@squiresanders.com

                                          **Attorneys for Debtors and Debtors in
                                          Possession**

                                          and

                                          /s/ *Eric R. Wilson*
                                          Eric R. Wilson, Esq.
                                          KELLEY DRYE & WARREN LLP
                                          101 Park Avenue
                                          New York, NY 10178
                                          (212) 808-5087 (Phone)
                                          (212) 808-7897 (Fax)
                                          ewilson@kelleydrye.com

                                          **Attorneys for Official Committee of
                                          Unsecured Creditors**

CINCINNATI/99443